Lyman H. Smith, S.
Eugene S. Boerner died on September 5, 1966, a resident of Yates County, New York. In accordance with decedent’s last will and testament and codicils, letters testamentary were issued to coexecutors, Lincoln Rochester Trust Company, of Rochester, New York and Roger L. Boerner on October 22, 1966.
The decedent, a noted rose hybridist, credited with having developed many world-famous rose species, was at the time of *145 his death an officer of the Jackson and Perkins Company, Inc., a wholesale rose grower and distributor with headquarters at Newark, New York. At the time of his death he owned approximately 12% of the outstanding shares of the company.
Several months prior to decedent’s death, and even prior to the date of his last will and testament, the president of Jackson and Perkins Company (Charles H. Perkins) had died owning approximately 51% of the outstanding shares of the company. Immediately thereafter, the Lincoln Rochester Trust Company, having been appointed coexecutor of the will of Charles H. Perkins, deceased, instituted a search for a purchaser for all of the shares of the Jackson and Perkins stock. Extended negotiations with several prospective purchasers and intensive negotiations with the Harry and David Company (of Oregon) eventually led to an agreement of sale dated August 13,1966, all of which gave rise to certain expenses. These expenses (arising from the sale) are the specific .subject of this proceeding.
“ Paragraph fourth ” of the Boerner will bequeaths decedent’s stock in the Jackson and Perkins Company to Cornell University (80%) and to the University of Illinois (20%) to establish endowment funds and professorial chairs in each institution, to be known in each university as the ‘1 Eugene S. Boerner Professorship ”, upon certain conditions for specified agricultural and educational uses, and subject to forfeiture should either university refuse to agree in advance to accept its legacy subject to the conditions set forth in said paragraph. Paragraph “fourth ” further provides as follows: “If prior to my death I shall have sold, or entered into a contract for the sale of such stock, the provisions of this “ fourth ” shall apply, in lieu of such stock, to any net proceeds of such sale which I have received or to which I or my estate may be entitled to receive as a result of the sale of such stock as shown on my books of account, including any securities or other property, or interest therein, which I may have purchased with the proceeds of such sale.”
As contemplated in the quoted language, the decedent, prior to his death, did in fact enter into a stock purchase agreement dated August 13, 1966, for the sale of his Jackson and Perkins Company stock. Negotiations respecting the execution of the sale agreement were involved and lengthy and generated closing costs, both before and after decedent’s death, particularly including attorneys’ fees, which costs and expenses ($22,265.06) create the question with which we are here concerned.
Specifically: Does the bequest of “ any net proceeds ” of sale of the subject stock (as quoted above) require that such sales *146 expenses be charged against the proceeds of the sale of the stock as received by the coexecutors, or should such éxpenses be a charge upon the decedent’s general estate as a debt or an administrative expense?
The two universities urge that the quoted portions of paragraph “ fourth ” contain a latent ambiguity in the broad use of the words “net proceeds” and “proceeds” which, from all the attendant circumstances, indicate that the testator meant to give the words “net proceeds ” and “ proceeds ” a special meaning quite opposite from their customary meaning in business use, and contrary to the usual legal definition. It is the contention of these universities that the testator carefully drafted his will in the standard language applicable to specific legacies in order to avoid any ademption which might be caused by sale or conversion of the shares of stock prior to his death and in an effort to protect these gifts from diminution by fees for legal or brokerage services.
While it is true that specific legacies will abate only upon failure of the residual estate to discharge debts (Taylor v. Dodd, 58 N. Y. 335), and that a legatee of a specific bequest must take it as and where it is and must pay any shipping or storing charges or liens then against it (Matter of Morawetz, 35 Misc 2d 762; Matter of Beaudry, 206 Misc. 749), nevertheless, in the instant case, this court is compelled to conclude that the testator well knew that the intricacies inherent in making a sale of a business as specialized and complicated as this one, would necessarily require substantial expenditures of time, effort and moneys (for reasonable attorneys’ fees and brokerage services). The history of the negotiations surrounding the sale indicates that such expenditures were indeed necessary.
From his life-long devotion to the development, culture and studies of the pathology of roses, and from his special relationship to these universities, these legatees contend that it was testator’s intention to maximize his charitable gifts (free of incidental expenses of sale) in order that these institutions might carry forward the work that had been so important to him in his lifetime. This theory is attractive aq.d would seem “ natural ” under all the circumstances. But, a cursory reading of his 14-page will also reveals that testator was careful and precise in his business affairs and not without commendable skill in spelling out minute instructions for the distribution and administration of his estate. It is significant that in the subject paragraph (paragraph “fourth”) he anticipated that the endowment fund to be established from the “ proceeds ” of the sale of his Jackson and Perkins stock might not produce income *147 sufficient to establish professorial chairs according to his desires and that in such event income should ‘1 be expended to establish one or more ‘ Eugene S. Boerner Scholarships’.” (See sub-paragraph “ E ”, paragraph “ fourth ”, of decedent’s last will and testament.)
The generally recognized meaning of the expression ‘ ‘ net proceeds” is applicable to the decedent’s will. “Net proceeds ” may be defined as “ Gross proceeds, less charges which may be rightly deducted ”. (Black’s Law Dictionary [4th ed., 1951].) The word “ net” means the balance remaining after deductions and, when applied to the proceeds of a sale, the word identifies the amount remaining after deducting all expenses of the sale from the sales price (see Matter of von Seidlitz, 6 Misc 2d 583). The term “ net proceeds ” is not normally considered ambiguous, and in the instant case, there are no facts or circumstances which would warrant an endorsement of such ambiguity. In many eases where net proceeds of sale of a specific legacy, have been bequeathed, the issue of ademption of the legacy has been raised, but without any question concerning the makeup of the “ net proceeds ” involved (cf. Matter of Caldwell, 6 Misc 2d 110; Matter of Roth, 183 Misc. 834, mod. on other grounds 271 App. Div. 972, motion to dismiss app. den. 296 N. Y. 994).
Listed in the account attached to the petition herein are expenses requisite to the procuring of an adequate sales price for testator’s stock and the closing of negotiations effecting such sale. They are reasonable and necessary expenses of sale which are to be deducted from the sales price in order to obtain the amount of the net proceeds.