[780 NYS2d 47]

JOSEPH DALTON et al., Appellants, v GEORGE PATAKI, as Governor of the State of New York, et al., Respondents. (Action No. 1.)

LEE KARR, Appellant, v GEORGE PATAKI, as Governor of the State of New York, et al., Respondents. (Action No. 2.)

Third Department, July 7, 2004

## APPEARANCES OF COUNSEL

*O'Connell & Aronowitz*, Albany (*Cornelius D. Murray* of counsel), for Joseph Dalton and others, appellants in Action No. 1.

*Jay Goldberg* and *Debra A. Karlstein*, New York City, for Lee Karr, appellant in Action No. 2.

*Eliot Spitzer, Attorney General*, Albany (*Caitlin J. Halligan* of counsel), for George Pataki and others, respondents.

*Gibson, Dunn & Crutcher L.L.P.*, New York City (*Randy M. Mastro* of counsel), for Park Place Entertainment Corporation, respondent.

*Hodgson Russ L.L.P.*, Buffalo (*Kevin M. Kearney* of counsel), for Finger Lakes Racing Association, Inc., respondent.

*Marvin Newberg*, Monticello, for Monticello Raceway Management, Inc., respondent.

*Harris Beach L.L.P.*, Pittsford (*Heidi Schult Gregory* of counsel), for Mid-State Raceway, Inc., respondent.

*Bleakley, Platt & Schmidt L.L.P.*, White Plains (*Frederick J. Martin* of counsel), for Yonkers Racing Association Corporation, respondent.

## OPINION OF THE COURT

MERCURE, J.

These consolidated actions have their roots in a prior Court of Appeals decision holding that defendant Governor lacks the authority to unilaterally execute tribal-state compacts with Indian tribes to allow casino gaming on Indian reservations (*see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801 [2003], *cert denied* 540 US 1017 [2003]). The Court concluded that the negotiation of such compacts involves issues affecting the health and welfare of state residents, implicating policy choices that lie solely within the province of the Legislature (*id.* at 822-823).[1] In 2001, the Legislature enacted a bill which, among other things, authorizes the Governor to enter into four tribal-state compacts for the operation of casino gam-

---

**1.** The Court also concluded that Indian tribes are not indispensable parties to litigation challenging the Governor's authority to enter into tribal-state compacts (*Saratoga County Chamber of Commerce v Pataki, supra* at 819-822). Although defendants argue that the decision was incorrect, their petition for a writ of certiorari has been denied (*Saratoga County Chamber of Commerce v Pataki*, 540 US 1017 [2003]). Therefore, we do not address defendants' argument that the tribes are indispensable parties in this action.

ing activities at up to six facilities on Indian lands (*see* L 2001, ch 383, part B) pursuant to the Indian Gaming Regulatory Act (hereinafter IGRA) (25 USC §§ 2701-2721; 18 USC §§ 1166-1168). As relevant here, part C of the law also permits the Division of the Lottery (hereinafter Division) to license and implement the operation of video lottery gaming at several pari-mutuel racetracks; part D of the law authorizes the Division to participate in a multistate lottery.

Plaintiffs, a group of citizen taxpayers, two state legislators, nonprofit organizations and an unincorporated association opposed to the spread of gambling, commenced these actions seeking a judgment declaring parts B, C and D of chapter 383 of the Laws of 2001 to be unconstitutional. Supreme Court granted defendants' cross motions for summary judgment dismissing the complaints and declared that parts B, C and D are constitutional and in conformance with federal law. Plaintiffs now appeal, asserting that these provisions violate NY Constitution, article I, § 9, which generally bans gambling in the state with certain exceptions. Plaintiffs argue in the alternative that parts B, C and D were enacted in violation of the "message of necessity" provision of the NY Constitution, which requires that a bill in final form be on legislators' desks for "at least three calendar legislative days [before] final passage, unless the governor . . . shall have certified, under his or her hand and the seal of the state, the facts which in his or her opinion necessitate an immediate vote thereon" (NY Const, art III, § 14).

Addressing the latter argument first, we conclude that the Governor's message of necessity satisfied the constitutional obligation. The message of necessity indicates that "[b]ecause the bills have not been on your desks in final form for three calendar legislative days, the Leaders of your Honorable Bodies have requested this message to permit their immediate consideration." It states that the "facts necessitating an immediate vote on the bills" are that the "bills are necessary to enact certain provisions of law."

Although the message is brief, we note that "[i]t is the Governor who must express the opinion that an immediate vote is desirable. The facts on which [the Governor] forms that opinion must satisfy [him or her]" (*Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.*, 30 NY2d 207, 219 [1972], *appeal dismissed* 409 US 1031 [1972]). Here, the message of necessity is reasonable and conforms to other such messages that have been upheld in the past (*see Nor-*

*wick v Rockefeller*, 70 Misc 2d 923, 931-934 [1972], *affd without op* 40 AD2d 956 [1972], *affd without op* 33 NY2d 537 [1973] [upholding a message of necessity that stated "(b)ecause the bill in its final form has not been on your desks three calendar legislative days the Leaders of your Honorable bodies have requested this message to permit its immediate consideration"]; *see also Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn., supra* at 219-220; *Matter of Joslin v Regan*, 63 AD2d 466, 468-469 [1978], *affd* 48 NY2d 746 [1979]). We note that "[t]he Legislature could [have said that] the time for consideration was too short. It did not say that, but accepting the Governor's certificate and considering the proposal in the time available, it passed it" (*Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn., supra* at 220). Given that the message of necessity "literally and reasonably conforms with [the] constitutional requirements" (*id.* at 220), we will not intervene to nullify the act.

■ Turning to the substance of plaintiffs' arguments, we will first address plaintiffs' challenges to part B of chapter 383 of the Laws of 2001. As explained in depth below, IGRA both "preempt[s] the field in the governance of gaming activities on Indian lands" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3076) and sets forth a mechanism by which states may exert some measure of control over gambling on Indian lands (*see Seminole Tribe of Fla. v Florida*, 517 US 44, 58 [1996]). We determine that, pursuant to IGRA, a state may enter into tribal-state compacts permitting particular class III, casino-type gaming activities on tribal lands if the state permits any person to conduct those particular gaming activities for any purpose, including a charitable purpose. That a compact permits a certain game to be conducted in a manner that is otherwise inconsistent with state law will not render it invalid if the game is not completely prohibited. Because New York permits the gaming activities at issue here for charitable purposes, subject to heavy regulation, the gaming is properly the subject of a tribal-state compact.

■, ■ Next, regarding part C of chapter 383 of the Laws of 2001, we conclude that video lottery gaming, as implemented by the Division, constitutes a valid, state-operated lottery and, thus, falls within the exception of such lotteries from the general ban on gambling in NY Constitution, article I, § 9 (1). We agree with plaintiffs, however, that the require-

ment in part C that a portion of video lottery terminal (hereinafter VLT) vendor fees be dedicated to breeding funds and enhanced purses violates the constitutional mandate that "the net proceeds" of state-operated lotteries "be applied exclusively to or in aid or support of education in this state as the [L]egislature may prescribe" (NY Const, art I, § 9 [1]). Moreover, we find that severing the portion of part C directing reinvestment does not cure the constitutional defect because severance would result only in an inflated vendor fee. Thus, while we conclude that video lottery gaming itself is a "lottery" within the meaning of NY Constitution, article I, § 9, we must modify Supreme Court's order to declare the entirety of part C of chapter 383 to be unconstitutional due to the impermissible revenue distribution scheme set forth therein.

■ Finally, we conclude that plaintiffs' challenges to part D of chapter 383 of the Laws of 2001 are meritless. New York retains sufficient control over the operation of the multistate lottery within its borders to meet the constitutional requirement that lotteries be "operated by the state" (NY Const, art I, § 9 [1]). Contrary to plaintiffs' further argument, the net proceeds generated by the multistate lottery remain in New York and are dedicated "exclusively to or in aid or support of education in this state" as required by NY Constitution, article I, § 9 (1). Thus, part D is constitutional.

Although plaintiffs also advance a number of policy-laden arguments before us, courts are not concerned with questions of legislative policy. While we determine that parts B and D of chapter 383 are constitutional and, generally speaking, video lottery may constitute a valid lottery within the meaning of that term in NY Constitution, article I, § 9, our inquiry in this case is limited to the constitutionality of the challenged legislation.

## I. *Tribal-State Compacts*

An understanding of both this state's historical approach to gambling, as well as the legislative history of IGRA and its interplay with state law, is essential to an analysis of the issues raised in connection with part B of chapter 383 of the Laws of 2001. Accordingly, we first examine the statutory and constitutional background of the case and then address the merits of plaintiffs' challenge to part B.

## A. *IGRA*

### 1. *Statutory Provisions*

The stated purpose of IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" (25 USC § 2702 [1]). The statute also provides a federal regulatory framework to shield such gaming "from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly" (25 USC § 2702 [2]; *see* 25 USC § 2702 [3]). Congress enacted IGRA upon a finding that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by [f]ederal law and is conducted within a [s]tate which does not, as a matter of criminal law and public policy, prohibit such gaming activity" (25 USC § 2701 [5]).

The statute divides gaming into three categories that are subject to differing levels of regulatory oversight depending on the type of gaming within each category. Class I gaming consists of "social games solely for prizes of minimal value or traditional" tribal games (25 USC § 2703 [6]). Class I gaming on Indian lands[2] is within the exclusive jurisdiction of Indian tribes (25 USC § 2710 [a] [1]). Class II gaming includes bingo and card games that are either expressly authorized or not explicitly prohibited by the state and legally played in the state (25 USC § 2703 [7] [A]). Class II gaming is defined to exclude "any banking card games, including baccarat, chemin de fer, or blackjack (21), or . . . electronic or electromechanical facsimiles of any game of chance or slot machines of any kind" (25 USC § 2703

---

**2.** The term "Indian lands" is defined as "all lands within the limits of any Indian reservation[,] and . . . any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power" (25 USC § 2703 [4]). Gaming on lands acquired after October 17, 1988 by the Secretary of the Interior and held in trust for the benefit of an Indian tribe—other than land within or contiguous to a reservation—is sharply curtailed (*see* 25 USC § 2719 [a]). As relevant here, gaming is permitted on after-acquired lands only if the Secretary finds, after consultation, that such gaming "would be in the best interest of the Indian tribe [and] would not be detrimental to the surrounding community," and the governor of the state concurs with the Secretary's determination; or the lands are taken in trust as part of (i) a land claim settlement, (ii) an initial reservation, or (iii) the restoration of Indian lands (25 USC § 2719 [b] [1] [A], [B]).

[7] [B]). Class II gaming on Indian lands is within the jurisdiction of the Indian tribes, subject to the provisions of IGRA, if "such Indian gaming is located within a [s]tate that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by [f]ederal law)" (25 USC § 2710 [b] [1] [A]; *see* 25 USC § 2710 [a] [2]).

Class III gaming, the type of gaming permitted by part B of chapter 383, is defined as "all forms of gaming that are not class I gaming or class II gaming" (25 USC § 2703 [8]). Class III gaming is the most heavily regulated of the three categories of gaming and is lawful on Indian lands only if three conditions are met. First, the gaming activities must be authorized by an ordinance or resolution of the governing body of the Indian tribe (*see* 25 USC § 2710 [d] [1] [A] [i]). Second, like class II gaming, class III gaming activities are permitted on Indian lands "only if such activities are . . . located in a [s]tate that permits such gaming for any purpose by any person, organization, or entity" (25 USC § 2710 [d] [1] [B]). Finally, class III gaming must be "conducted in conformance with a [t]ribal-[s]tate compact entered into by the Indian tribe and the [s]tate" (25 USC § 2710 [d] [1] [C]). The compacting requirement "allows states to negotiate with tribes that are located within their borders regarding aspects of class III Indian gaming that might affect legitimate state interests" (*Artichoke Joe's Cal. Grand Casino v Norton*, 353 F3d 712, 716 [2003]; *see* 25 USC § 2710 [d] [3] [C]). Although states are required under IGRA to negotiate in good faith upon receiving a request to enter into negotiations with an Indian tribe (*see* 25 USC § 2710 [d] [3] [A]), nothing in the statute compels a state to *accept* a proposed compact (*see* 25 USC § 2710 [d] [7] [B] [vii] [describing the procedure to be followed by the Secretary of the Interior to permit class III gaming on state lands where a state does not consent to a compact]; 25 CFR part 291 [same]). Moreover, compacts will take effect only if approved by the Secretary of the Interior (*see* 25 USC § 2710 [d] [3] [B]).

Here, plaintiffs assert that while state laws, including constitutions, do not normally apply on Indian lands because Congress has exclusive authority over Indian affairs unless it vests such power in the states (*see McClanahan v State Tax Commn. of Ariz.*, 411 US 164, 170-171 [1973]), IGRA provides that *all* state laws regarding gambling apply on Indian lands. Specifically, plaintiffs note that IGRA makes "all [s]tate laws

pertaining to the licensing, regulation, or prohibition of *gambling*, including but not limited to criminal sanctions applicable . . . in Indian country in the same manner and to the same extent as such laws apply elsewhere in the [s]tate" (18 USC § 1166 [a] [emphasis added]). Plaintiffs' argument fails, however, because the term "gambling" *excludes* "class III gaming conducted under a [t]ribal-[s]tate compact approved by the Secretary" (18 USC § 1166 [c] [2]). That is, under 18 USC § 1166, state laws regulating gambling do not apply to class III gaming otherwise permitted under IGRA. Class III gaming is allowed on Indian lands by IGRA if, as relevant here, it is "conducted in conformance with a [t]ribal-[s]tate compact" (25 USC § 2710 [d] [1] [C]) and "in a [s]tate that *permits such gaming for any purpose by any person, organization, or entity*" (25 USC § 2710 [d] [1] [B] [emphasis added]).

Plaintiffs argue in the alternative that New York does not "permit[ ] such gaming"—i.e., casino gambling—and, thus, the condition contained in 25 USC § 2710 (d) (1) (B) is not met here. Plaintiffs point to a ban on commercialized gambling—as opposed to gambling for charitable purposes—in NY Constitution, article I, § 9 as evidence that New York does not permit the type of casino gaming that is to be authorized in the four tribal-state compacts contemplated by part B of chapter 383. Defendants counter that because the NY Constitution permits class III gaming for some purposes, New York cannot unilaterally prohibit such gaming on Indian lands. Indisputably, the term "permits such gaming for any purpose by any person, organization, or entity" defines the scope of class III games in which Indians may engage and that a tribal-state compact may address (*see Artichoke Joe's Cal. Grand Casino v Norton, supra* at 720-723; *United States v Santee Sioux Tribe of Neb.*, 135 F3d 558, 563-564 [1998], *cert denied* 525 US 813 [1998]; *Citizen Band Potawatomi Indian Tribe of Okla. v Green*, 995 F2d 179, 181 [1993]; *United States v Santa Ynez Band of Chumash Mission Indians of Santa Ynez Reservation, Cal.*, 33 F Supp 2d 862, 863 [1998]). While that term may be susceptible to more than one interpretation, a review of the legislative history of IGRA convinces us that defendants have the better argument regarding the meaning of the term.

2. *Legislative History of IGRA*

Our review of the background of IGRA necessarily begins with *California v Cabazon Band of Mission Indians* (480 US 202 [1987]). Congress developed IGRA in response to *Cabazon*

(*see* S Rep No. 100-446, 100th Cong, 2d Sess, reprinted in 1988 US Code Cong & Admin News, at 3071), a case addressing California's regulation of bingo games conducted by Indian tribes on reservation land. Ruling that the tribes were not required to adhere to state regulation of the games (*see California v Cabazon Band of Mission Indians, supra* at 211-212), the US Supreme Court began its analysis by reaffirming the long-settled principle that "Indian tribes retain attributes of sovereignty over both their members and their territory . . . and that tribal sovereignty is dependent on, and subordinate to, only the [f]ederal [g]overnment, not the [s]tates" (*id.* at 207 [internal quotation marks and citations omitted]; *see New Mexico v Mescalero Apache Tribe*, 462 US 324, 332 [1983]). Nevertheless, the Court explained, state law may apply on Indian lands if Congress expressly so provides or, in the absence of express congressional consent, where state law is not preempted (*see California v Cabazon Band of Mission Indians, supra* at 207, 215-216).

The Court concluded that the particular statute at issue, Public Law 280 (Pub L 83-280, 67 US Stat 588 [1953]), did not make California law applicable to bingo played on Indian lands. The Court explained that Public Law 280 drew a distinction between "criminal/prohibitory" laws and "civil/regulatory" state laws, stating:

> "if the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the [s]tate's public policy" (*California v Cabazon Band of Mission Indians*, 480 US at 209).

After noting that in addition to bingo, California permits a substantial amount of gambling activity—including a state lottery, pari-mutuel horse betting and various card games—the Court determined that "California regulates rather than prohibits gambling in general and bingo in particular" (*id.* at 211), despite a prohibition in the California Penal Code on bingo for noncharitable purposes. In addition, after balancing the interests of the federal government and Indian tribes against the state's interest in regulating high-stakes bingo played on

Indian lands, the Court concluded that California law was preempted by Public Law 280, explaining that "[s]tate regulation would impermissibly infringe on tribal government" (*id.* at 222).

While *Cabazon* involved a different statute than that before us, the case remains instructive. Congress enacted IGRA, in part, to clarify that courts should *not* engage in the balancing test used by the US Supreme Court to determine whether state law is preempted with respect to gaming on Indian lands. In this regard, the Select Committee on Indian Affairs report on IGRA indicates that "in the final analysis, it is the responsibility of the Congress, consistent with its plenary power over Indian affairs, to balance competing policy interests and to adjust, where appropriate, the jurisdictional framework of regulation of gaming on Indian lands" (S Rep No. 100-446, 100th Cong, 2d Sess, at 3, reprinted in 1988 US Code Cong & Admin News, at 3071, 3073). Congress also incorporated into IGRA a modified version of the prohibitory/regulatory distinction articulated in *Cabazon*. Under the statute, "courts will consider the distinction between a [s]tate's civil and criminal laws to determine whether a body of law is applicable, as a matter of [f]ederal law, to either allow or prohibit certain activities" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3076).

The report discusses in depth the requirement that class II gaming be permitted if "located within a [s]tate that permits such gaming for any purpose by any person, organization or entity" (25 USC § 2710 [b] [1] [A])—language which also appears in the portion of the statute relating to class III gaming and defines the scope of class III gaming that a tribal-state compact may address, as noted above. The report makes clear:

> "The phrase 'for any purpose by any person, organization or entity' makes no distinction between [s]tate laws that allow class II gaming for charitable, commercial, or governmental purposes, or the nature of the entity conducting the gaming. If such gaming is not criminally prohibited by the [s]tate in which tribes are located, then tribes, as governments, are free to engage in such gaming" (S Rep No. 100-446, 100th Cong, 2d Sess, at 12, reprinted in 1988 US Code Cong & Admin News, at 3071, 3082).

The report thus demonstrates that with respect to class II gaming, "Congress intended to permit a particular gaming activ-

ity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity" (*United States v Sisseton-Wahpeton Sioux Tribe*, 897 F2d 358, 365 [1990]). Although the report expressly addressed language in 25 USC § 2710 (b) (1) (A) relating to class II gaming, the identical phrase—providing that gaming may be located only in "a [s]tate that permits such gaming for any purpose by any person, organization or entity"— appears in section 2710 (d) (1) (B) with respect to class III gaming. Inasmuch as the same word or phrase used in different parts of a statute will be presumed to have the same meaning throughout in the absence of an indication of an intent to the contrary (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 236, at 401), we agree with defendants that under IGRA, class III games that are not prohibited are properly the subject of negotiation in tribal-state compacts even if those games are heavily regulated and permitted to be played only by charities (*see Mashantucket Pequot Tribe v State of Connecticut*, 913 F2d 1024, 1029-1030 [1990], *cert denied* 499 US 975 [1991]; *Coeur d'Alene Tribe v State*, 842 F Supp 1268, 1274-1275 [1994], *affd* 51 F3d 876 [1995], *cert denied* 516 US 916 [1995]; *see also Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 842 [2003], *supra* [Read, J., dissenting] ["IGRA mandates that, if a state allows *any* class III gaming by *any* person, a tribe may seek to conduct the same games on its lands"]).

Plaintiffs' interpretation—that the term "such gaming" in the phrase "permits such gaming for any purpose by any person, organization, or entity" should be read to mean "gaming for commercial purposes"—renders 25 USC § 2710 (d) (1) (B) incoherent. If "such gaming" is read to refer to gaming for a particular purpose, as "commercialized gambling" refers to gambling for the purpose of commercial gain, the phrase "for any purpose" would be rendered meaningless. Because "[i]t is an accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided" (*Rocovich v Consolidated Edison Co.*, 78 NY2d 509, 515 [1991]), plaintiffs' interpretation must be rejected. We agree with defendants that the phrase "such gaming" refers to the antecedent term "class III gaming"—a type of gaming defined by the rules of the particular games contained therein, rather than by the purpose for which the games are played, such as for profit or for charity. Again, this interpretation is consistent with the legislative his-

tory of IGRA, which indicates that the relevant inquiry is whether a particular game is criminally prohibited, not whether the game is played for commercial, charitable or governmental purposes (*see* S Rep No. 100-446, 100th Cong, 2d Sess, at 12, reprinted in 1988 US Code Cong & Admin News, at 3071, 3082).

Defendants err, however, in asserting that simply because any class III gaming is allowed by a state, *all* class III gaming is properly the subject of a tribal-state compact. While the Select Committee on Indian Affairs report explains that tribes are prohibited from operating bingo—a class II game—in the five states which criminally prohibit the game, the report analyzed other class II games, such as card games, separately, stating that such games "are permitted by far fewer [s]tates" (S Rep No. 100-446, 100th Cong, 2d Sess, at 11-12, reprinted in 1988 US Code Cong & Admin News, at 3071, 3082). We find the report's differing treatment of specific games within a gaming class significant inasmuch as it is indicative of a congressional intent that courts look to state law to determine whether *particular* gaming activities are permitted (*see Cheyenne Riv. Sioux Tribe v State of South Dakota*, 3 F3d 273, 278-279 [1993]; *Mashantucket Pequot Tribe v State of Connecticut, supra* at 1029; *Coeur d'Alene Tribe v State, supra* at 1276-1280; *Lac du Flambeau Band of Lake Superior Chippewa Indians v State of Wisconsin*, 770 F Supp 480, 487-488 [1991], *appeal dismissed* 957 F2d 515 [1992], *cert denied* 506 US 829 [1992]; *see also Saratoga County Chamber of Commerce v Pataki, supra* at 843 n 10 [Read, J., dissenting]; *cf. Rumsey Indian Rancheria of Wintun Indians v Wilson*, 64 F3d 1250, 1258-1259 [1994], *amended* 99 F3d 321 [1996], *cert denied* 521 US 1118 [1997] [concluding that class II legislative history is not applicable to class III gambling, but nevertheless holding that a state need not negotiate with Indian tribes regarding particular gaming activities in which the state forbids others to engage]).[3]

---

**3.** To the extent that defendants rely upon *Mashantucket Pequot Tribe v State of Connecticut (supra)* for the proposition that Indian tribes may engage in *all* types of class III gaming if a state permits *any* type of class III gaming, they misinterpret that case. In *Mashantucket*, the Second Circuit held that Connecticut must negotiate in good faith with tribes that seek to offer the same types of casino games of chance that the state permitted nonprofit organizations to conduct (*id.* at 1029-1032). We note that in its analysis, the court relied upon a statement by the Eighth Circuit that " 'the legislative history reveals that Congress intended to permit *a particular gaming activity*, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that *particular gaming*

Accordingly, in determining whether New York "permits such gaming" for purposes of satisfying the condition contained in 25 USC § 2710 (d) (1) (B), "the question is not whether these games may be characterized as Las Vegas-style or commercialized gambling, but whether a particular game is" permitted under our Constitution, statutes and applicable regulations (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 843 n 10 [2003], *supra* [Read, J., dissenting]). "[I]f a state does not permit 'such gaming,' the matter is at an end" (*Mashantucket Pequot Tribe v State of Connecticut, supra* at 1028-1029) and a compact purporting to authorize prohibited gambling will not be valid (*see Artichoke Joe's Cal. Grand Casino v Norton*, 353 F3d 712, 720-723 [2003], *supra*; *United States v Santee Sioux Tribe of Neb.*, 135 F3d 558, 563-564 [1998], *supra*; *Citizen Band Potawatomi Indian Tribe of Okla. v Green*, 995 F2d 179, 181 [1993], *supra*; *United States v Santa Ynez Band of Chumash Mission Indians of Santa Ynez Reservation, Cal.*, 33 F Supp 2d 862, 863 [1998], *supra*). Contrary to defendants' argument that the "permits such gaming" requirement is satisfied if the state allows *any* class III gaming, we conclude that if a particular class III game is not permitted by New York law under any circumstances, a tribal-state compact will not be upheld insofar as it purports to authorize a tribe to conduct that game on Indian lands.

To summarize, while IGRA "preempt[s] the field in the governance of gaming activities on Indian lands" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3076; *see Gaming Corp. of Am. v Dorsey & Whitney*, 88 F3d 536, 546 [1996]), it also gives states, through the tribal-state compacting process, a power withheld from them by the US Constitution—i.e., "some measure of authority over gaming on Indian lands" (*Seminole Tribe of Fla.*

activity'" (*id.* at 1029, quoting *United States v Sisseton-Wahpeton Sioux Tribe*, 897 F2d 358, 365 [1990], *supra* [emphasis added]). Contrary to defendants' arguments, we conclude that *Mashantucket* should be read as holding that the "permits such gaming" language in 25 USC § 2710 (d) (1) (B) refers to the state allowing the *specific* gaming activities at issue (*see Coeur d'Alene Tribe v State*, 842 F Supp 1268, 1277 [1994], *supra*; *Seminole Tribe of Fla. v Florida*, 1993 WL 475999, 1993 US Dist LEXIS 21387 [SD Fla, Sept. 22, 1993, Marcus, J.]; *cf. Artichoke Joe's Cal. Grand Casino v Norton*, 353 F3d 712, 716-717 [2003], *supra* [stating that in *Mashantucket,* the Second Circuit agreed with the argument that where a state permits other types of class III gaming, it cannot refuse to negotiate over any type of class III gaming]; *Yavapai-Prescott Indian Tribe v State of Arizona*, 796 F Supp 1292, 1296 [1992] [same]).

*v Florida*, 517 US 44, 58 [1996], *supra*). Nevertheless, this authority does not amount to a blanket imposition on tribes of all state laws regarding gambling activity. Instead, consistent with traditional principles of tribal sovereignty, the compacting process constitutes "a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have [s]tate laws and [s]tate jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow [s]tate jurisdiction on Indian lands for the regulation of Indian gaming activities" (S Rep No. 100-446, 100th Cong, 2d Sess, at 5-6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3075). We emphasize, however, that Indian tribes may not engage in class III gaming activities if those particular activities are not "located in a [s]tate that permits such gaming for any purpose by any person, organization, or entity" (25 USC § 2710 [d] [1] [B]). That is, gaming activities that are not permitted by a state cannot be the subject of a tribal-state compact or played on Indian lands. We must therefore determine what gaming activities are permitted under the NY Constitution and laws regulating gambling.

## B. *Gaming in New York*

New York has generally prohibited gambling throughout its history, with certain exceptions. The state's first Constitution, in 1777, did not mention gambling or lotteries and numerous statutes authorized public lotteries to raise money for a variety of purposes by the colony and state from 1746 through 1821 (*see* 3 Lincoln, The Constitutional History of New York, at 34-43 [1906]; *see also People ex rel. Ellison v Lavin*, 93 App Div 292, 300 [1904], *revd on other grounds* 179 NY 164 [1904]; *Matter of Dwyer*, 14 Misc 204, 205-206 [1894]). The second Constitution, approved in 1821, however, expressly prohibited lotteries not already authorized by law stating: "No lottery shall hereafter be authorized in this state; and the [L]egislature shall pass laws to prevent the sale of all lottery tickets within this state, except in lotteries already provided for by law" (1821 NY Const, art VII, § 11). An amendment prohibiting horse racing was also proposed but rejected by the Constitutional Convention of 1821 (*see* 3 Lincoln, The Constitutional History of New York, at 45 [1906]).

The third Constitution contained a similar provision that prohibited lotteries but remained silent on other forms of gambling, providing: "nor shall any lottery hereafter be autho-

rized, or any sale of lottery tickets allowed within this state" (1846 NY Const, art I, § 10). In 1887, the Legislature enacted the Ives Pool Law, authorizing gambling on horse racing during certain times of the year with a five percent tax on revenues to be used for the support of horse breeding (L 1887, ch 479). This form of gambling was subsequently forbidden by the fourth Constitution, approved in 1894 (*see* 3 Lincoln, The Constitutional History of New York, at 47 [1906]). Article I, § 9 provided: "nor shall any lottery or the sale of lottery tickets, pool-selling, book making, or any other kind of gambling hereafter be authorized or allowed within this [s]tate" (1894 NY Const, art I, § 9). An identical provision appeared in the current Constitution, when it was approved in 1938.

Since that time, NY Constitution, article I, § 9 has been amended five times.[4] The effect of these amendments has been to broaden the scope of permissible gambling in the state through a series of exceptions to the general prohibition on gambling. In 1939, the section was amended to except pari-mutuel betting on horse races from the prohibition on gambling. A 1957 amendment authorized localities to permit religious, charitable and nonprofit organizations to conduct bingo or lotto. A 1966 amendment permitted the state to conduct a lottery, with the net proceeds to be used to support education. Most relevant here, section 9 (2) was amended in 1975 to allow localities to permit, in addition to bingo and lotto, "games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance." Subsequently, in 1984, the Constitution was amended again to provide that the previously mandatory $250 limit on single prizes and $1,000 limit on a series of prizes in games permitted by the 1957 and 1975 amendments could be varied by law.

As amended, the current version of NY Constitution, article I, § 9 (1) thus reads in pertinent part:

> "except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in

---

4. In addition to these five amendments, article I, § 9 was amended in 2001 to render it gender neutral, as was the rest of the Constitution.

connection therewith as may be authorized and prescribed by the [L]egislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the [L]egislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the [L]egislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state."

NY Constitution, article I, § 9 (2) provides:

"any city, town or village within the state may by an approving vote of the majority of the qualified electors . . . authorize, subject to state legislative supervision and control, the conduct of one or both of the following categories of games of chance commonly known as: (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance."

Subdivision (2) imposes a number of restrictions on permissible gaming, in addition to any others that the Legislature may prescribe. Specifically, subdivision (2) provides that "only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games; . . . the entire net proceeds of any game shall be exclusively devoted to the lawful purposes of such organizations; . . . no person except a bona fide member of any such organization shall participate in the management or operation of such game; . . . no person shall receive any remuneration for participating in the management or operation of any such game[; and u]nless otherwise provided by law, no single prize shall exceed [$250], nor shall any series of prizes on one occasion aggregate more than [$1,000]" (NY Const, art I, § 9 [2]). Subdivision (2) further directs the Legislature to "pass appropriate laws to effectuate the purposes of this subdivision [and to] ensure that such games are rigidly regulated to prevent commercialized gambling" (NY Const, art I, § 9 [2]). Notably,

subdivision (2) expressly permits the Legislature to pass laws restricting the gambling permitted by that section (NY Const, art I, § 9 [2]).

The foregoing illustrates that while the NY Constitution generally bans gambling and evinces a strong policy against *commercialized* gambling, at least some form of gambling has been authorized throughout most of the state's history. Indeed, the NY Constitution contained a complete prohibition on gambling only from 1894 to 1939 and now permits several forms of gambling, some of which would be deemed class III gaming under IGRA (*see* 25 USC § 2703 [7], [8]). The legalization of certain forms of gambling "indicate[s] that the New York public does not consider authorized gambling a violation of 'some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal' " (*Intercontinental Hotels Corp. [Puerto Rico] v Golden*, 15 NY2d 9, 15 [1964], quoting *Loucks v Standard Oil Co.*, 224 NY 99, 111 [1918]), as plaintiffs would have us hold. Instead, "[t]he trend in New York State demonstrates an acceptance of *licensed* gambling transactions as a morally acceptable activity, not objectionable under the prevailing standards of lawful and approved social conduct" (*Intercontinental Hotels Corp. [Puerto Rico] v Golden, supra* at 15; *see generally Ramesar v State of New York*, 224 AD2d 757, 759 [1996], *lv denied* 88 NY2d 811 [1996] [noting that public policy generally continues to disfavor gambling and, thus, regulations pertaining thereto must be strictly construed]).

Regarding "games of chance," the 1975 amendment permits, on its face, "games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance." Plaintiffs do not dispute that this provision allows Las Vegas or casino nights, subject to the limits imposed in NY Constitution, article I, § 9 (2), and that charities currently engage in millions of dollars worth of casino gambling per year (*see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 844 [2003], *supra* [Read, J., dissenting]). Nor do plaintiffs assert that the state prohibits charities and nonprofit organizations, during their Las Vegas or casino nights, from engaging in any of the 31 games listed in the compact that the Governor executed with the Seneca Nation pursuant to part B of chapter 383 of the Laws of 2001. In this regard, we note that the 1975 Senate debate leading to this constitutional amendment indicates that the purpose of the amendment was to expand the types of games in which religious,

charitable or nonprofit organizations could legally engage to include Las Vegas night casino-type gambling, such as roulette, blackjack and dice games (see New York State Senate Debate on Senate Bill S 2509, June 19, 1975, at 8234-8235, 8239-8242, 8259, 8266-8268, 8271-8272)—games authorized in the Seneca Nation compact, as well.

For example, Senator B.C. Smith, in answering Senator Lewis's objection to the amendments allowing "Las Vegas night" and "roulette wheel[s]" in houses of worship (id. at 8234-8235), stated that "your synagogues, your churches and your fire departments in certain sections of the state are doing just this, just the very thing that is legalized by this proposition" (id. at 8239). He explained that many fire departments and churches could not survive without "their bazaars and fairs" (id. at 8241) and that, while people operating such fairs were arrested in certain counties (id. at 8239-8240), "when [he] was District Attorney of [his] county, . . . [he] wouldn't arrest anybody that was running a firemen's affair . . . [with] big six" (id. at 8241-8242). Indeed, Senator Lewis, who strongly opposed the amendment on the ground that it could potentially "make every one of the institutions, religious and eleemosynary, a pseudo or partial casino," conceded that roulette wheels "exist[ ] in my community and they have [them] in the fairs all around me, and the police, if they are involved, look the other way" (id. at 8245). Further, Senator Rolison, in explaining the bill, indicated that dice games, such as craps, would be permitted under the amendment (id. at 8259). These excerpts from the debates demonstrate that the 1975 amendment was intended to except from the general prohibition on gambling the precise types of casino gaming contemplated by part B of chapter 383 of the Laws of 2001, provided that such gaming was conducted for charitable purposes.

This conclusion is further supported by reference to the text and history of General Municipal Law article 9-A, which the Legislature enacted pursuant to the 1975 amendment and which codifies the definition of permissible games of chance. At the time it was enacted, General Municipal Law § 186 (3) provided:

> " 'Games of chance' shall mean and include specific games of chance, in which prizes are awarded on the basis of a designated winning number or numbers, color or colors, symbol or symbols determined by chance, but not including games commonly known as 'bingo or lotto' which are controlled under

article [14-H] of this chapter and also not including 'slot machines', 'bookmaking', and 'policy or numbers games' as defined in [Penal Law § 225.00]. No game of chance shall involve wagering of money by one player against another player."

The legislative debates and history regarding the enactment of General Municipal Law article 9-A similarly evince an acknowledgment that the definition contained in section 186 was intended to include casino-type games (*see e.g.* New York State Senate Debate on Senate Bill S 9101, June 26, 1976, at 9649-9651 [stating that dice games, blackjack and baccarat are among the games permitted under the statute]; Mem of State Racing and Wagering Board, at 2, Bill Jacket, L 1976, ch 960 [indicating that "roulette, dealer blackjack and baccarat" would be permissible]).[5] These games, such as blackjack, craps, roulette and baccarat, generally would be considered class III gaming under IGRA (*see* 25 USC § 2703 [8]). Pursuant to General Municipal Law § 186 (3), the Racing and Wagering Board lists a number of casino-type games, such as craps, roulette, blackjack and big six, that may be conducted in this state (*see* 9 NYCRR 5620.1). Again, these games fall into the category of class III gaming under IGRA (*see* 25 USC § 2703 [8]).

In sum, despite a ban on commercialized gambling, a general prohibition on all gambling except that expressly authorized and a history that includes a 45-year period during which gambling was banned completely, New York now constitutionally permits a substantial amount of gambling. The 1975 amendment to the Constitution and implementing legislation and regulations (*see* General Municipal Law § 186 [3]; 9 NYCRR 5620.1), in particular, were intended to permit charities, religious organizations and other nonprofit groups to conduct the types of gaming categorized as class III by IGRA.

Inasmuch as the state permits, subject to heavy regulation and various restrictions, others to engage in the type of gaming activities at issue here, it merely regulates, as opposed to

---

**5.** It is worth noting that the Legislature was not unfamiliar with the term "game of chance" or "contest of chance" at the time that the 1975 amendment was approved and the General Municipal Law was enacted (*see* Penal Law § 225.00; Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 225, at 196-197). In fact, the term has an extensive legal history (*see People ex rel. Ellison v Lavin,* 179 NY 164, 168-171 [1904]) and has been interpreted to include such games as "stud" poker (*see People v Dubinsky,* 31 NYS2d 234, 237 [Ct of Special Sessions 1941])—a class III game under IGRA (*see* 25 USC § 2703 [8]).

completely bars, those gaming activities.[6] For purposes of IGRA, then, the state "permits such gaming for any purpose by any person, organization, or entity" (25 USC § 2710 [d] [1] [B]). Accordingly, the class III gaming at issue is properly the subject of a tribal-state compact and part B of chapter 383 of the Laws of 2001 authorizing the Governor to enter into such compacts is consistent with both IGRA and NY Constitution, article I, § 9.[7]

We similarly conclude that part B is consistent with the requirement in NY Constitution, article I, § 9 (2) that the Legislature "pass appropriate laws to . . . ensure that such games are rigidly regulated to prevent commercialized gambling." Plaintiffs' argument that part B violates this requirement is premised on their incorrect belief that New York laws relating to gaming activities apply with the same force and effect on Indian lands as they do elsewhere within the state. As explained above, because Indian tribes retain attributes of sovereignty, state law applies on Indian lands only if Congress so provides or state law is not preempted (*see California v Caba-*

---

**6.** Because plaintiffs do not challenge the constitutionality of any of the specific games contemplated by the Seneca Nation compact and none of the parties provides any analysis of how each game is played in their briefs before us, we do not address whether any particular game listed, as opposed to class III gaming in general, is a "game of chance" within the meaning of NY Constitution, article I, § 9 or General Municipal Law article 9-A. Although we recognize that the determination of whether a state "permits such gaming" should be made on a game-by-game basis (*see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 843 n 10 [2003], *supra* [Read, J., dissenting]), in the absence of any challenge or analysis by the parties, we assume that the particular class III games in the compact are constitutional for the purposes of this decision only and confine our ruling to the issue advanced before us—whether the ban in NY Constitution, article I, § 9 (2) on "commercialized gambling" amounts to a prohibition of *all* class III gaming for purposes of IGRA.

**7.** Plaintiffs make much of our statement in *Saratoga County Chamber of Commerce v Pataki* (293 AD2d 20 [2002], *affd* 100 NY2d 801 [2003], *cert denied* 540 US 1017 [2003]) that "the commercialized Las Vegas style gambling authorized by the compact is the antithesis of the highly restricted and 'rigidly regulated' forms of gambling permitted by the NY Constitution . . . and New York's established public policy disfavoring gambling" (*id.* at 24, quoting NY Const, art I, § 9 [2]). In *Saratoga*, we addressed only the issue of whether the Governor had the authority to execute tribal-state compacts in the absence of legislative approval (*id.* at 21). Thus, the statement on which defendants rely was dictum and their reliance is misplaced. In any event, we also noted in that case that the state's "restrictive statutes and constitutional provisions . . . , although generally banning gambling and at all times evidencing a strong policy against commercialized gambling, may have unwittingly opened the door to Indian casino gaming through the subsequently enacted IGRA" (*id.* at 25).

*zon Band of Mission Indians*, 480 US 202, 207, 215-216 [1987], *supra*). In the context of casino gaming on Indian lands, IGRA both determines the extent to which state law applies to gaming on Indian lands (*see Seminole Tribe of Fla. v Florida*, 517 US 44, 58 [1996], *supra*; *see also Artichoke Joe's Cal. Grand Casino v Norton*, 353 F3d 712, 716 [2003], *supra*; *Keweenaw Bay Indian Community v United States*, 136 F3d 469, 472 [1998], *cert denied* 525 US 929 [1998]) and "preempt[s] the field in the governance of gaming activities on Indian lands" (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3076).

States do not have the authority to regulate class III gaming on Indian lands other than through the compacting procedure outlined in IGRA. States are not *required* by IGRA to agree to compacts (*see* 25 USC § 2710 [d] [7] [B] [vi], [vii]), although they may choose to enter, via the compacting process, an otherwise preempted field if their actions are in compliance with the federal standards embodied in IGRA. Should a state refuse to participate in the negotiation process, the result would be only that the state would lose its ability to influence the terms on which gaming will occur, with such authority reverting to the Secretary of the Interior (*see* 25 USC § 2710 [d] [7] [B] [vii]; 25 CFR part 291). Thus, IGRA cannot be interpreted as a federal directive that requires states to assume a regulatory role in violation of the anticommandeering principle contained in the 10th Amendment of the US Constitution (*see Ponca Tribe of Okla. v State of Oklahoma*, 37 F3d 1422, 1432-1435 [1994], *revd on other grounds* 517 US 1129 [1996]; *Yavapai-Prescott Indian Tribe v State of Arizona*, 796 F Supp 1292, 1297 [1992]; *see generally Printz v United States*, 521 US 898, 926 [1997]). Instead, the IGRA compacting process is best understood as providing states with the opportunity to establish "some measure of authority over gaming on Indian lands[,] . . . a power withheld from them by the Constitution" (*Seminole Tribe of Fla. v Florida, supra* at 58).

Stated differently, IGRA does not force New York to accept a particular compact. It simply affords the state the opportunity to assert authority over gaming on Indian lands, a power that the state otherwise lacks. Because part B of chapter 383 of the Laws of 2001 permits the Governor to enter into tribal-state compacts *extending* state regulatory authority to commercialized casino gambling on Indian lands—where such authority would not otherwise exist—we cannot say that the Legislature

has violated the constitutional mandate to pass laws limiting commercialized gambling.[8] Rather, part B permits the Governor to assume a role in setting the terms and restrictions pursuant to which Indian gaming will occur, and thereby limit such gaming in a manner consistent with the state's interests.

Plaintiffs' remaining arguments regarding part B of chapter 383 require little discussion. Plaintiffs contend that the Governor cannot, consistent with New York public policy as set forth in the NY Constitution, concur with the Secretary of the Interior that gaming on Indian lands other than an existing reservation would not be detrimental to surrounding communities. Plaintiffs' argument is unpersuasive. Before gaming may occur on lands held in trust by the federal government for the benefit of Indian tribes, the Governor's concurrence is required (*see* 25 USC § 2719 [b] [1] [A]). We note that the statute leaves the decision to the Governor whether, in his judgment, gaming on Indian lands would be detrimental—i.e., have adverse social and economic consequences—on the surrounding communities (*see* 25 USC § 2719 [b] [1] [A]). It does not require a determination that the gaming would fall within one of the constitutional exceptions to the state's general prohibition on gambling or that the gaming would be lawful if conducted on state land. Second, while New York does have a strong policy against *commercialized* gambling, "the New York public does not consider authorized gambling a violation of 'some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal' " (*Intercontinental Hotels Corp. [Puerto Rico] v Golden*, 15 NY2d 9, 15 [1964], *supra* [citation omitted]). Hence, the Governor's concurrence cannot be said to violate New York public policy.

Finally, we reject plaintiffs' argument that part B of chapter 383 represents an unlawful delegation of power to the Governor because it provides no legislative guidance with respect to future compacts in Ulster and Sullivan Counties. Part B adequately

---

**8.** Plaintiffs observe that 25 USC §§ 232 and 233 grant New York criminal and civil jurisdiction over Indian lands and suggest that this authority extends to gaming activities on Indian lands. To the extent that 25 USC §§ 232 and 233 conflict with IGRA—i.e., insofar as those statutes provide that the state retains authority over gaming other than that agreed to in a tribal-state compact—we conclude that IGRA impliedly repealed those statutes (*see generally State of Rhode Island v Narragansett Indian Tribe*, 19 F3d 685, 703-705 [1994], *cert denied* 513 US 919 [1994], abrogated by statute as stated in *Narragansett Indian Tribe v National Indian Gaming Commn.*, 158 F3d 1335, 1337-1338 [1998]).

sets forth the parameters for compacts between New York and Indian tribes. It indicates the number of casinos permitted, the general location of those casinos, and a number of provisions that must be included in the compacts regarding, among other things, access of labor unions for purposes of soliciting employee support for representation, binding arbitration of labor disputes, assurances that the tribes have adequate civil recovery systems to protect the rights of visitors and guests, and assurances that the tribes will maintain sufficient liability insurance to compensate visitors and guests for injuries that might occur. We conclude that in part B, " 'the basic policy decisions underlying the [executive action] have been made and articulated by the Legislature' " (*Bourquin v Cuomo*, 85 NY2d 781, 785 [1995] [citation omitted]). That part B leaves discretion to the Governor in negotiating compacts with Indian tribes merely permits compliance with the state's obligation to engage in good-faith negotiations (*see* 25 USC § 2710 [d] [3] [A]) and does not render the provision an unlawful delegation of authority.

## II. *VLTs*

Part C of chapter 383 of the Laws of 2001 authorizes the Division to license and operate VLTs at eight licensed pari-mutuel racetracks. Pursuant to the statute, five racetracks—Aqueduct, Monticello, Yonkers, Finger Lakes and Vernon Downs—are automatically eligible to apply for a license to install VLTs (*see* L 2001, ch 383, part C, § 1; Tax Law § 1617-a [a]). Upon approval from the governing body of the appropriate counties, certain harness racetracks—Saratoga Equine Sportscenter, Batavia and Buffalo—may also install VLTs (*see* L 2001, ch 383, part C, § 1; Tax Law § 1617-a [a]; Racing, Pari-Mutuel Wagering and Breeding Law art 3).[9] Three other racetracks—Belmont Park, Saratoga Thoroughbred Racetrack and the New York State Exposition in Onondaga County—are not eligible to install VLTs (*see* L 2001, ch 383, part C, § 1; Tax Law § 1617-a [a]). The statute directs that the payout for prizes is to be 90% of sales (*see* L 2001, ch 383, part C, § 2; Tax Law § 1612 [c] [3]). As originally enacted, part C provided that the balance of the total revenue was to be paid to education after deducting 15% for the Division's operating and administrative costs and a "vendor's fee" of between 12% and 25% to be paid to the racetrack (*see* L 2001, ch 383, part C, § 2). The statute required that each racetrack reinvest a percentage

---

**9.** The parties indicate that each of the jurisdictions authorized to approve the operation of VLTs at local racetracks has now done so.

of its vendor fee to support higher purses and the appropriate breeding fund at the racetrack (*see* L 2001, ch 383, part C, § 2).[10]

The operation of VLTs is described in requests for proposals (hereinafter RFPs) issued by the Division inviting potential vendors to submit proposals for the implementation and operation of a VLT system. The system is to be comprised of three components: (1) video display terminals that accept players' paper currency, credit or account cards, game identifier and price selections, and permit players to view the results of their purchased electronic instant lottery tickets; (2) site controllers that link a number of video display terminals to a central system, store and manage unpurchased electronic ticket series and are programmed to dispense electronic lottery tickets in the sequence received from and determined by the central system; and (3) a central system that randomly shuffles and stores electronic ticket series, distributes the tickets to site controllers, monitors all system activity, and performs accounting and security functions. The RFPs contemplate participation by multiple VLT players who will compete against each other by purchasing electronic instant lottery tickets from a finite depleting pool of tickets in a given series. Indeed, video display terminals *must* be linked electronically to allow players to compete against other players for a chance to purchase winning electronic lottery tickets. An electronic ticket series consists of a finite set of tickets from a particular instant game pool and, upon creation, is intermixed to ensure randomness. The ticket series is stored in the central system until divided into smaller quantities and sent to site controllers.

To play video lottery, a player inserts paper currency or another Division-approved representative of value into a video display terminal to purchase one or more electronic instant lottery tickets. The player determines the particular game and amount to be wagered. The next situated electronic ticket is then dispensed from the site controller to the display terminal,

---

**10.** As amended, the Tax Law caps the operational and administrative costs for the Division at 10% and sets the vendor fee at a flat rate of 29% (*see* Tax Law § 1612 [b]). The statute has also been amended to alter the reinvestment percentages for purses and breeding funds. Reinvestment was initially set at 35% in the first year and 45% in subsequent years for purses, and at no less than 5% for breeding funds (*see* L 2001, ch 383, part C, § 2). Reinvestment percentages for purses are now set at 25.9% for the first three years, 26.7% in the fourth and fifth years and 34.5% in subsequent years; for breeding funds, the rate is set at 4.3% in the first five years and 5.2% for subsequent years (*see* Tax Law § 1612 [c] [1]).

which shows the outcome associated with that ticket. The player cannot affect the outcome associated with the ticket beyond selecting the type of game to be played; the tickets are predetermined to be either winners or losers before the time of purchase. Once a player has purchased a ticket, it is removed from the pool of available electronic tickets in a given series and cannot be selected or dispensed again. Upon completion of play, the player receives a redemption ticket that can be used for wagering at another display terminal or presented for verification and payment at a validation terminal.

VLTs thus may be understood as presenting electronic versions of the instant-ticket lottery games conducted by the Division. As with "scratch-off" tickets, an electronic instant lottery ticket is a winning or nonwinning ticket at the time of its creation and no skill on the part of the player is involved in the game. The distribution of electronic tickets, like scratch-off tickets, is random. In both paper and electronic instant lottery games, players compete against each other in the sense that once an instant ticket is removed from a series, the finite pool of tickets in that series shrinks for all players. The only other game permitted on VLTs is electronic keno, in which players compete against each other by choosing a series of numbers, colors or symbols from a finite pool in the hope that their selections will match those later randomly drawn by the central system.

Plaintiffs challenge part C of chapter 383 on two primary grounds. First, they argue that VLTs are slot machines and, thus, do not fit within the exception of state-run lotteries from the general ban on gambling in NY Constitution, article I, § 9. Second, plaintiffs assert that the directive in part C that racetracks reinvest a percentage of their vendor fees in purses and breeding funds violates the constitutional mandate that the net proceeds of state-operated lotteries "be applied exclusively to or in aid or support of education in this state as the [L]egislature may prescribe" (NY Const, art I, § 9 [1]). We address each of these arguments in turn.

## A. *VLTs and Slot Machines*

Plaintiffs contend that VLTs are, in reality, slot machines. They assert that slot machines cannot be "lotteries" within the meaning of that term in NY Constitution, article I, § 9 (1) and, thus, part C of chapter 383 of the Laws of 2001 is unconstitutional. Plaintiffs compare the description of the video display

terminals used in video lottery gaming that is found in the Division's RFPs to the definition of "[s]lot machine" contained in Penal Law § 225.00 (8), which states in relevant part: " 'Slot machine' means a gambling device which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such manner that, depending upon elements of chance, it may eject something of value."

Plaintiffs aver that the 1966 amendment to NY Constitution, article I, § 9 authorizing the state to conduct lotteries permits only traditional sweepstakes lotteries with periodic drawings. Specifically, they assert that the NY Constitution permits only those types of lotteries in which licensed vendors sell tickets for later drawings to occur with extremely limited frequency and at which winning numbers would be selected at some central headquarters. If the lottery ticket purchased by the consumer contained the winning number, that consumer would collect a pool of winnings that depended on the total number of tickets purchased. Plaintiffs contend that machines or gaming systems, such as VLTs, that permit games to be played with infinite frequency are slot machines and therefore cannot be considered to offer "lottery" games. Alternatively, plaintiffs contend that under the definition in General Municipal Law § 186 (3), as amended by part B, § 5 of chapter 383 of the Laws of 2001, video lottery cannot be a "lottery." We disagree.

In determining whether games offered on the VLTs implemented by the Division pursuant to part C constitute "lotteries," we are mindful of the rule that a legislative enactment may be found unconstitutional only upon a "demonstrat[ion of] the statute's invalidity 'beyond a reasonable doubt' " (*LaValle v Hayden*, 98 NY2d 155, 161 [2002], quoting *People v Tichenor*, 89 NY2d 769, 773 [1997], *cert denied* 522 US 918 [1997]). Defendants note that the NY Constitution does not define the term "lotteries." They urge us to adopt a broad definition of that term, used by the courts primarily in interpreting the penal statutes, that a game is a lottery if it involves the three elements of consideration, chance and prize (*see e.g. People v Hines*, 284 NY 93, 101-103 [1940]; *People v Miller*, 271 NY 44, 47 [1936]; *see also Trump v Perlee*, 228 AD2d 367, 368 [1996] [defining lottery as containing those three elements in a taxpayers' action seeking to enjoin the defendants from operating the game known as "Quick Draw"]; *Harris v Economic Opportunity Commn. of Nassau County*, 171 AD2d 223, 227 [1991] [holding

that, in an action by the winner of a raffle to recover a prize, a raffle had elements of consideration, chance and prize and was therefore an illegal lottery]). Inasmuch as play on VLTs indisputably involves those three elements, defendants argue that part C of chapter 383 is constitutional.

We agree with defendants that VLTs are simply a new method of presenting lottery games to the public and, therefore, the operation of VLTs by the state falls within the constitutional exception to the general ban on gambling. We conclude, however, that the 1966 amendment creating the exception that authorized a state-run lottery—pursuant to which part C was enacted—must be strictly construed to ensure that the exception does not swallow the rule (*see generally Molina v Games Mgt. Servs.*, 58 NY2d 523, 529 [1983]; *Matter of New York Racing Assn. v Hoblock*, 270 AD2d 31, 33-34 [2000]; *People v Kim*, 154 Misc 2d 346, 351 [1992]; *see also* McKinney's Cons Laws of NY, Book 1, Statutes § 213, at 372).

The elements of consideration, chance and prize are present in all forms of gambling or games of chance (*see generally* Penal Law § 225.00 [2] [defining "gambling"]). Pursuant to the definition advanced by defendants, *any* game of chance—including such casino games as poker, blackjack, craps and roulette—could be a lottery if operated by the state. Such a broad interpretation would expand the constitutional exception permitting state-run lotteries to such an extent that it would swallow the general constitutional prohibition on gambling (*see* 1984 Ops Atty Gen No. 84-F1, at 19-24; 1981 Ops Atty Gen 68, at 72). NY Constitution, article I, § 9 cannot support such a broad reading. Nevertheless, we conclude that even pursuant to a stricter reading of the term "lotteries," video lottery gaming passes muster.

The term "lotteries" must be interpreted with reference to the language of the constitutional exception itself and the legislative history of the amendment, as well as related statutory and constitutional provisions. In its general prohibition, NY Constitution, article I, § 9 refers to a lottery as one of several forms of gambling, stating that "except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling . . . shall hereafter be authorized or allowed within this state" (NY Const, art I, § 9 [1]). "[L]ottery," as used in article I, § 9, can thus be understood to mean a distinct, narrower form of the broad term "gambling," which is defined by the three elements of consideration, chance and prize (*see* Penal Law § 225.00 [2] [defining "gambling" as

"stak(ing) or risk(ing) something of value upon the outcome of a contest of chance[11] or a future contingent event not under (one's) control or influence, upon an agreement or understanding that he (or she) will receive something of value in the event of a certain outcome"]; *see also Johnson v Collins Entertainment Co.*, 333 SC 96, 101, 508 SE2d 575, 577-578 [1998] [concluding that where a state constitution distinguishes between lottery and gambling or other games of chance, lottery must be defined in a narrow sense]; *Poppen v Walker*, 520 NW2d 238, 244-245 [SD 1994] [same]; Eisenrauch, *Video Poker and the Lottery Clause: Where Common Law and Common Sense Collide*, 49 SC L Rev 549, 567-572 [1998] [same]).

The lottery exception itself authorizes "lotteries operated by the state and the sale of lottery tickets in connection therewith" (NY Const, art I, § 9 [1]). On its face, the constitutional exception contemplates that state-run lotteries involve the sale of tickets, i.e., lots or chances (*see* NY Const, art I, § 9 [1]; *see also* 1981 Ops Atty Gen 68, at 72). The Senate debates on the lottery amendment[12] also indicate that the Legislature conceived of the sale of tickets and multiple participation as integral elements of lotteries (*see* New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4808 ["(L)ottery is . . . a prize, a consideration and multiple participation"]; *see also* New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4764-4765, 4796-4800; New York State Senate Debate on Senate Bill S 897, Feb. 7, 1966, at 290, 298, 309, 311, 360-361). Indeed, one of the sponsors of the amendment, Senator Brownstein, predicted that millions of tickets would be sold (New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4769).

Moreover, while the debates reflect an intent to leave the amendment deliberately vague with respect to the mechanics of the lottery (*see* New York State Senate Debate on Senate Bill S 897, Feb. 7, 1966, at 319 ["(W)hen we passed the pari-mutuel betting amendment in 1939, . . . it did not include the mechanics of how it was to be worked. What we are only involved with here is the question of whether or not we should allow the general practice of lottery"]; *see also* New York State Senate Debate

---

11. "Contest of chance" is defined as "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein" (Penal Law § 225.00 [1]).

12. The debate of the Assembly on the amendment evidently was not transcribed (*see* 1981 Ops Atty Gen 68, at 75).

on Senate Bill S 897, Feb. 7, 1966, at 331-332, 341-342, 351, 363; New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4796, 4807-4809), the amendment does expressly refer to the sale of tickets. This explicit reference to tickets emphasizes that, despite an intent to leave to the Legislature's discretion the details of the operation of the lottery, the use of randomly-drawn tickets to determine a winner or winners is a necessary component of any state-run lottery authorized pursuant to the NY Constitution. Similarly, the implementing legislation, enacted contemporaneously in 1967, refers to the sale of tickets and multiple players (see L 1967, ch 278, § 1 [creating Tax Law former § 1305 (a), (b)]). Hence, we conclude that in addition to the elements of consideration, chance[13] and prize traditionally employed by this state's case law in defining the term "lottery" for law enforcement purposes (see e.g. People v Hines, 284 NY 93, 101-103 [1940], supra; People v Miller, 271 NY 44, 47 [1936], supra), NY Constitution, article I, § 9 (1) sanctions only those state-run lotteries that involve tickets and multiple participation.

Support for our conclusion that a lottery is defined by the elements of consideration, chance, prize, tickets and multiple participation may also be found in the Penal Law. The requirement that a lottery involve multiple participation can be found in the definition of lottery contained in the 1965 Penal Law revision, enacted by the same Legislature that drafted and initially approved the lottery amendment. Although the scope of the constitutional amendment authorizing lotteries is not determined by the Penal Law, we note that the Legislature had before it the new definition of lottery contained in that statute when crafting the lottery exception and, thus, that definition informs our reading of the amendment. The relevant statutory language has not been altered since the 1965 revision. Specifically, Penal Law § 225.00 (10) defines "[l]ottery" as:

> "an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other

---

**13.** The parties do not dispute that the games offered on VLTs involve pure chance, in the sense that electronic tickets are randomly drawn with no element of skill involved. Therefore, it is not necessary for us to decide whether a lottery may incorporate any element of skill (see generally People ex rel. Ellison v Lavin, 179 NY 164, 170-171 [1904]; Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 225, at 196).

media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value."

In referring to "players" participating in a "drawing" or some other random event, the statute contemplates multiple participation, as opposed to a single player competing against a single machine. The statute also refers to consideration in the form of "something of value" paid by players, determination of winners by a method based on chance, and a prize to be paid to the holders of the winning "chances," or lots (see Penal Law § 225.00 [10]; see also 1981 Ops Atty Gen 68, at 74).

Pursuant to the definition of lottery contemplated by NY Constitution, article I, § 9, the video lottery gaming offered on VLTs authorized by part C of chapter 383 of the Laws of 2001, as described in the Division's RFPs, is permissible. As explained above, to play video lottery on VLTs, players give consideration—paper currency or another lottery-approved representative of value inserted into a display terminal—and, after selecting the game identifier and price per ticket, receive an electronic ticket from a series in which winning tickets are selected in advance and randomly distributed among all tickets to be sold. To play electronic keno, players select numbers, colors or symbols in the hope of matching those randomly drawn by the central system from a larger finite pool of numbers, colors or symbols. The player's success is a matter of pure chance, dependent only on the random distribution of predetermined winning tickets by the central system to site controllers or randomly drawn keno numbers, colors or symbols. If the player wins, he or she receives a prize which may be redeemed by printing an electronically encoded instrument that can be presented for payment at a validation terminal or used for play at another display terminal. The element of multiple participation is present because players compete against each other by purchasing tickets from a finite depleting pool of electronic instant lottery tickets, with a set number of predetermined winning tickets, or in choosing a series of keno numbers, colors or symbols from a finite pool in the hope that they, as opposed to other players, will have matched those colors, numbers or symbols later drawn.

Further, play on VLTs involves tickets, albeit electronic tickets, which are transferred from the central system to site

controllers and then to display terminals upon purchase, but which are not printed or reduced to paper. These electronic tickets are the functional equivalent of paper tickets—they are "evidence of one's entitlement to a prize over claims by competing ticket-holders" (*Johnson v Collins Entertainment Co.*, 333 SC 96, 104 n 10, 508 SE2d 575, 579 n 10 [1998], *supra*). Similarly, the player's recorded keno choices to be played in a later drawing are also the functional equivalent of a paper ticket. Indeed, keno is no different from current lottery games, such as "Quick Draw," which have been upheld as constitutional under NY Constitution, article I, § 9 (1) (*see Trump v Perlee*, 228 AD2d 367, 368 [1996], *supra*). To play Quick Draw, individuals select a subset of numbers, in the hope of matching numbers drawn by the Division.

In our view, the fact that the tickets used in VLT play are electronic, as opposed to paper, does not defeat a finding that VLTs are permissible within the meaning of NY Constitution, article I, § 9. In short, play on VLTs involves the elements of consideration, chance, prize, multiple participation and tickets and, thus, the operation of VLTs by the state falls within the constitutional exception to the general ban on gambling.

We reject plaintiffs' argument that VLTs are slot machines within the meaning of the Penal Law and, thus, the games offered on VLTs cannot be "lotteries." As noted above, the Penal Law defines a slot machine as "a *gambling device* which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such [a] manner that, depending upon elements of chance, it may eject something of value" (Penal Law § 225.00 [8] [emphasis added]). A "[g]ambling device," however, is defined to exclude "lottery tickets . . . and other items used in the playing phases of lottery" (Penal Law § 225.00 [7]). Because VLTs are devices used in the playing phases of a lottery, they cannot be considered slot machines as a matter of law, regardless of their outward resemblance to such machines (*see People v Kim*, 154 Misc 2d 346, 353-354 [1992], *supra* [concluding that a lotto machine used for play in a lottery did not qualify as a gambling device]; *cf. Matter of Black N. Assoc. v Kelly*, 281 AD2d 974, 975-976 [2001] [vending machine that dispensed calling cards and sweepstakes game pieces and instantly displayed the results in a slot machine-like video display, in the absence of a finding that the game was a lottery, was a slot machine]).

Plaintiffs' reliance on General Municipal Law § 186 (3) for the proposition that VLTs are impermissible slot machines is

misplaced. While General Municipal Law § 186 (3), as originally enacted, defined "[g]ames of chance" to exclude both "slot machines" and lotteries, the statute was amended pursuant to part B of chapter 383 to remove the exclusion of slot machines from the definition of "[g]ames of chance" (*see* L 2001, ch 383, part B, § 5). Inasmuch as slot machines now fall within the statutory definition of "[g]ames of chance" while lotteries do not, plaintiffs reason that the two games are mutually exclusive. Plaintiffs then argue that because VLTs resemble impermissible slot machines, they cannot be "lotteries." This mutual exclusivity, however, does not advance plaintiffs' argument that VLTs are impermissible slot machines. Again, a slot machine is a type of "gambling device" (Penal Law § 225.00 [8]) and gambling devices are defined to exclude "items used in the playing phases of lottery" (Penal Law § 225.00 [7]). Although display terminals outwardly resemble slot machines, VLT play involves the elements of a lottery—consideration, chance, prize, multiple participation and tickets—and, therefore, VLTs do not fulfill the legal definition of slot machine (*see* Penal Law § 225.00 [7], [8]).

Moreover, there is no merit to plaintiffs' argument that because video lottery gaming is not the precise type of lottery contemplated by the 1966 Legislature in drafting the constitutional amendment, it is impermissible. Although, as plaintiffs assert, the Senate debates on the amendment include references to sweepstakes lotteries with infrequent drawings (*see e.g.* New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4765, 4777, 4807; New York State Senate Debate on Senate Bill S 897, Feb. 7, 1966, at 315), the 1966 amendment authorizing lotteries neither refers to any particular kind of lottery nor places limits on the number of drawings or methods of operating a lottery. Indeed, although certain senators opposed the amendment on the ground that the constitutional language was "indefinite," had no limit on the number of drawings to be held in a given year and did not specify the type of lottery authorized (*see* New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4796-4797, 4814; New York State Senate Debate on Senate Bill S 897, Feb. 7, 1966, at 315, 335-336, 341), the amendment, as passed, left these issues to the Legislature's discretion.

We conclude that the NY Constitution contains no bar to the modernization of the lottery or the introduction of new technological methods of delivering lottery tickets to the public. Nor is the state limited to the precise types of lotteries familiar to the public in 1966. Indeed, we note again that "Quick Draw,"

a nontraditional form of lottery, has been upheld as constitutional (*see Trump v Perlee*, 228 AD2d 367, 368 [1996], *supra*). Similarly here, the fact that video lottery was not contemplated at the time of the amendment does not render it unconstitutional.

Plaintiffs' reliance on 1981 and 1984 New York Attorney General opinions in arguing that the video lottery games offered on VLTs are not lotteries is similarly unwarranted. Those opinions were given in regard to games that are distinguishable. The 1981 opinion addressed proposed video games, such as computer poker and blackjack, that did not involve multiple participation or electronic tickets (*see* 1981 Ops Atty Gen 68). Instead, the games there involved a single player pitting his or her skill against a machine (*see id.* at 72-75). The 1984 opinion involved a proposal by the Division to permit betting on the outcome of professional sports events (*see* 1984 Ops Atty Gen No. 84-F1). The Attorney General concluded that such betting is more in the nature of pool-selling and bookmaking than a lottery and, thus, did not fall within the exception of state-run lotteries from the general ban on gambling (*see id.* at 11-12). While those opinions do indicate that the 1966 Senate debates on the lottery amendment refer to traditional sweepstakes lotteries (*see* 1984 Ops Atty Gen No. 84-F1, at 14-15; 1981 Ops Atty Gen 68, at 75-76), nothing in the opinions suggests that the constitutional authorization was limited to those types of lotteries. Further, although the opinions conclude that the lottery exception must be interpreted narrowly and that lotteries must include the elements of consideration, chance, prize, tickets and multiple participation, there is no indication that electronic games meeting those criteria would be impermissible (*see* 1984 Ops Atty Gen No. 84-F1, at 17-18; 1981 Ops Atty Gen 68, at 72-75).[14]

Finally, we reject plaintiffs' assertion that part C of chapter 383 violates plaintiff Lee Karr's rights to equal protection

---

**14.** Similarly, the cases from other states relied upon by plaintiffs involve gaming that is distinguishable from VLTs, such as video poker and other games that did not involve multiple-participant drawings or tickets (*see Johnson v Collins Entertainment Co.*, 333 SC 96, 104, 508 SE2d 575, 579 [1998], *supra*; *Crochet v Priest*, 326 Ark 338, 345-347, 931 SW2d 128, 132-133 [1996]; *Poppen v Walker*, 520 NW2d 238, 247-248 [SD 1994], *supra*) or do not address the merits of the issue (*see State of West Virginia ex rel. Mountaineer Park v Polan*, 190 W Va 276, 283-285, 438 SE2d 308, 315-317 [1993]; *cf. State ex rel. Cities of Charleston, Huntington & Its Counties of Ohio & Kanawha v West Virginia Econ. Dev. Auth.*, 214 W Va 277, 287-292, 588 SE2d 655, 665-670 [2003]).

because it does not give his local legislative body the opportunity to disapprove the siting of VLTs at the Monticello racetrack, despite requiring the approval of the relevant local legislatures to permit VLTs to be operated at the Saratoga Equine Sportscenter, Batavia and Buffalo harness racetracks. Plaintiffs assert that part C infringes upon Karr's right to vote. Even assuming that part C, in drawing a geographic distinction among different racetracks, somehow implicates an individual citizen's right to vote, "a [s]tate is not prohibited from recognizing the distinctive interests of the residents of its political subdivisions" even in reference to voter classification (*City of New York v State of New York*, 76 NY2d 479, 486 [1990]; *see Town of Lockport, N.Y. v Citizens for Community Action at Local Level, Inc.*, 430 US 259, 269-273 [1977]). Here, the difference in classification could have been justified by a legislative conclusion that while the racetracks that needed no further approval had poor attendance records and would benefit the most from the installation of VLTs, the need for assistance at other tracks was not as critical even though those tracks could benefit from the additional business that VLTs would bring (*see generally Matter of Roosevelt Raceway v County of Nassau*, 18 NY2d 30, 40-41 [1966], *appeal dismissed* 385 US 453 [1967]). This justification forecloses plaintiffs' equal protection challenge.

## B. *Application of Lottery Revenues to Education*

Plaintiffs argue that part C of chapter 383 of the Laws of 2001, in requiring vendors to dedicate a portion of their fees to breeding funds and for the purpose of enhancing purses at the racetracks where VLTs are located (*see* L 2001, ch 383, part C, § 2; Tax Law § 1612 [c] [1]), violates the constitutional mandate that "the net proceeds" of state-run lotteries "be applied exclusively to or in aid or support of education in this state" (NY Const, art I, § 9 [1]). Plaintiffs concede that a vendor fee is a legitimate cost of operating a lottery and may be deducted from net lottery proceeds consistent with NY Constitution, article I, § 9. Nevertheless, they challenge the vendor fee here on the ground that it is not based solely on the cost of housing VLTs because a portion of that fee is set aside for reinvestment in enhanced purses and breeding funds.[15]

Defendants contend that the reinvestment requirement cannot be considered a deduction from the "net proceeds" within

---

15. Breeding funds are public benefit corporations that are statutorily required to distribute assets to a variety of entities, including 4-H societies, New York State exposition breeding farms, and county and town agricultural

the meaning of NY Constitution, article I, § 9 because the reinvestment comes from the vendor fee and the ultimate disposition of that fee is not subject to the constitutional limitation that net proceeds be applied to support education. We disagree and hold instead that the Legislature lacks the discretion to direct that lottery revenues may be used for noneducational purposes.

As defendants observe, the NY Constitution does not define "net proceeds," but the term is generally defined by the courts as gross proceeds less any expenses or costs that may be properly deducted (*see Matter of Boerner*, 58 Misc 2d 144, 147 [1968]; *Matter of von Seidlitz*, 6 Misc 2d 583, 584 [1957]; *see also* Black's Law Dictionary 1222 [7th ed 1999] [defining "net proceeds" as "(t)he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)"]). While we agree with the parties that vendor fees generally constitute a necessary administrative cost of housing and installing VLTs, those fees may not be artificially inflated to include expenses that are not necessary administrative costs. We are unpersuaded that reinvestment in breeding funds and enhanced purses is a necessary expense of the vendors housing VLTs, unlike such costs as space, staffing and security needs. In our view, by providing that 40%-50% of the vendor fee is to be reinvested in breeding funds and enhanced purses, the Legislature has signaled that the vendors themselves do not require that portion of the fee as compensation. Simply put, reinvestment in breeding funds and enhanced purses is not a reasonable, necessary expense or cost of maintaining VLTs and, thus, funds dedicated for that purpose cannot be deducted from the net proceeds of the lottery without violating the requirement in NY Constitution, article I, § 9 (1) that lottery revenues be used to support education.

Fundamentally, defendants err in asserting that this allocation of revenue is a permissive legislative judgment. To be sure, the NY Constitution provides that "the net proceeds of [state-run lotteries] shall be applied exclusively to or in aid or support of education in this state *as the [L]egislature may prescribe*" (NY Const, art I, § 9 [1] [emphasis added]). The phrase "as the

---

societies (*see* Racing, Pari-Mutuel Wagering and Breeding Law § 332). The vendor fee originally was set by the Division at 25% of the total sales remaining after payout of prizes (*see* L 2001, ch 383, part C, § 2 [permitting the Division to establish a vendor's fee of 12%-25% of the revenue remaining after payout for prizes]). The statute has been amended to set the vendor fee at 29% (*see* Tax Law § 1612 [b]).

[L]egislature may prescribe" does give the Legislature discretion in the allocation of the "net proceeds" of lottery revenues. This discretion, however, is subject to the limitation that net proceeds must go "exclusively to or in aid or support of education" (NY Const, art I, § 9 [1]).[16] Here, defendants make no argument that the reinvestment in breeding funds and enhanced purses somehow aids or supports education, except to the extent that such reinvestment *may* draw more people to racetracks who *might*, in turn, use VLTs and generate more lottery revenues. Such a tenuous, incidental connection between the reinvestment requirement and education simply does not satisfy the constitutional requirement that net proceeds be devoted to educational purposes.

Indeed, the Senate and Assembly debates on part C of chapter 383 indicate that the purpose of the reinvestment requirement was not to benefit education, but to contribute to the enhancement of horse racing, specifically, and agriculture, generally (*see* New York State Senate Debate on Senate Bill S 5828, Oct. 24, 2001, at 11599; New York State Assembly Debate on Assembly Bill A 9459, Oct. 25, 2001, at 22-23). Contrary to defendants' argument, the racing industry is not merely an indirect beneficiary of part C of chapter 383; instead, the racing industry is a direct recipient of lottery revenues via the reinvestment requirement. In our view, a holding that the Legislature has the discretion to divert a portion of lottery revenues to noneducational purposes, regardless of the laudable nature of those purposes, would defeat the requirement that the amendment authorizing state-run lotteries be construed narrowly, as an exception to the general ban on gambling (*see generally Molina v Games Mgt. Servs.*, 58 NY2d 523, 529 [1983], *supra*; *Matter of New York Racing Assn. v Hoblock*, 270 AD2d 31, 33-34 [2000], *supra*; *People v Kim*, 154 Misc 2d 346, 351 [1992], *supra*), as well as the spirit of the amendment, which requires that lottery revenues be earmarked for the support of education (*see* New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4764, 4787-4788; New York State Senate Debate on Senate Bill S 897, Feb. 7, 1966, at 251, 290, 300-301).

The cases relied upon by defendants in arguing that the reinvestment of revenues in breeding funds and enhanced

---

**16.** In this regard, Tax Law § 1612 (b) provides that lottery revenues are to be paid into the state treasury to the credit of the state lottery fund created by State Finance Law § 92-c, which then earmarks the funds for educational purposes.

purses does not violate NY Constitution, article I, § 9 are distinguishable (*see Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn.*, 30 NY2d 207, 217 [1972], *supra*; *Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund*, 22 NY2d 119, 122-123 [1968]). Those cases were decided pursuant to the 1939 constitutional amendment permitting pari-mutuel betting on horse racing. Specifically, that amendment authorizes "pari-mutuel betting on horse races as may be prescribed by the [L]egislature and from which the state shall derive *a reasonable revenue for the support of government*" (NY Const, art I, § 9 [1] [emphasis added]). The cases interpret the language "reasonable revenue for the support of government" (NY Const, art I, § 9 [1]; *see Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Commn., supra* at 217 [concluding that distribution of a portion of horse racing revenues to municipalities constituted reasonable revenue for political subdivisions of state government]; *Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund, supra* at 122-123 [concluding that the statute does not require that all revenue in excess of expenses be devoted to the direct support of the government]). They do not involve the constitutional requirement that "net proceeds" from state-run lotteries "be applied exclusively to or in aid or support of *education*" (NY Const, art I, § 9 [1] [emphasis added]).

We note that if the amendment had been intended to require that only such portion of lottery revenues as the Legislature deemed reasonable be dedicated to education, it could have included the same "reasonable revenue" language used in the 1939 amendment permitting pari-mutuel betting on horse racing. The lottery amendment, however, refers to net proceeds, not reasonable revenue. Moreover, although the breeding funds are "the instrument through which the Legislature has chosen to effectuate [the] legitimate public interest and purpose" of applying a certain portion of the revenues from racing to the "general improvement of the sport and the facilities used" (*Saratoga Harness Racing Assn. v Agriculture & N.Y. State Horse Breeding Dev. Fund, supra* at 123), the distribution of lottery revenues to these breeding funds or to enhanced purses cannot be said to aid or support education, as required by the amendment authorizing state-run lotteries. Hence, to the extent that the statute artificially inflates vendor fees and then requires that a portion of those fees be applied to noneducational

purposes, part C of chapter 383 of the Laws of 2001 violates NY Constitution, article I, § 9 (1).[17]

Defendants assert that even if racetracks may not be directed to transfer a portion of their vendor fees to purses and breeding funds under NY Constitution, article I, § 9, the invalid portion of part C should be severed. As defendants observe, part C provides that "[i]f any clause, sentence, provision, paragraph, subdivision, section, or part of this act" is found invalid, the remainder of the act "shall not be affected" (L 2001, ch 383, part C, § 3). Defendants urge us, in the event of a holding that part C violates NY Constitution, article I, § 9, to sever only the invalid reinvestment portion of the legislation.

In determining whether an invalid portion may be severed and the remainder of the statute preserved, the test is " 'whether the [L]egislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots' " (*Matter of Westinghouse Elec. Corp. v Tully*, 63 NY2d 191, 196 [1984], quoting *People ex rel. Alpha Portland Cement Co. v Knapp*, 230 NY 48, 60 [1920], *cert denied* 256 US 702 [1921]). Here, the inclusion of the severability clause indicates that the Legislature would have wished the statute enforced with the invalid portion severed (*see* L 2001, ch 383, part C, § 3; *Matter of New York State Superfund Coalition v New York State Dept. of Envtl. Conservation*, 75 NY2d 88, 94 [1989]). Were we to excise only the reinvestment portion of part C, however, the vendors would simply retain the inflated fee. That is, if the portion of part C, § 2 imposing the reinvestment requirement were struck from the statute, the revenues dedicated to enhanced purses and breeding funds would not be paid into the state trea-

---

**17.** Our analysis is not dependent on the particular percentages of the vendor fee to be reinvested. Instead, we conclude that the Legislature lacks the authority to direct *any* reinvestment in purses or breeding funds under NY Constitution, article I, § 9. Thus, the Legislature's amendments to Tax Law § 1612 modifying the percentages of the vendor fee to be reinvested and the amount of the vendor fee itself (*see* Tax Law § 1612 [c] [1]; L 2003, ch 63, part W, §§ 2, 3; ch 62, part Z3, § 1) do not render the issue moot or materially alter our analysis (*cf. Flanders Assoc. v Town of Southampton*, 198 AD2d 328, 328 [1993]; *Matter of Schulz v State of New York*, 182 AD2d 3, 4-5 [1992], *appeal dismissed* 80 NY2d 924 [1992], *lv denied* 80 NY2d 761 [1992]; *Lake v Regan*, 135 AD2d 312, 316 [1988], *appeal dismissed* 72 NY2d 840 [1988], *lv denied* 72 NY2d 807 [1988]).

sury to the credit of the state lottery fund created by State Finance Law § 92-c and earmarked for education, along with the balance of revenue generated by VLTs. Instead, under the remaining language of part C, the vendors would retain a fee that the Legislature, in directing that a portion should be reinvested elsewhere, has determined those vendors do not require to assure the availability of VLTs for public convenience (*see generally* Tax Law § 1604 [a] [9]). Such a result cannot stand.

In short, merely severing the reinvestment portion of the legislation does not cure the constitutional defect because the statute was drafted in such a way that severance would result in distributing to vendors the funds that are constitutionally required to be earmarked for education. Nor can we substitute our judgment for that of the Legislature by establishing a fee percentage that we would deem reasonable. We conclude that the first two paragraphs of part C, § 2 of chapter 383 of the Laws of 2001, amending Tax Law former § 1612 by adding subdivision (a) (5) (A) and (B) and setting forth the distribution of VLT revenue and directing vendors to reinvest a portion of their fee are inextricably intertwined. As a practical matter, the language of the statute regarding reinvestment cannot be removed so as to permit the statute to operate in a constitutional manner. Further, severing the entire revenue distribution scheme as set forth in Tax Law former § 1612 (a) (5) (A) and (B), while leaving the remainder of the statute intact, would essentially leave the statute inoperable—the result of severance would be either an inflated vendor fee or no fee at all. Under these circumstances, severance is inappropriate. " 'It would be pragmatically impossible, as well as jurisprudentially unsound, for us to attempt to identify and excise particular provisions while leaving the remainder . . . intact, since the product of such an effort would be a regulatory scheme that . . . the Legislature . . . [never] intended' " (*Matter of New York State Superfund Coalition v New York State Dept. of Envtl. Conservation, supra* at 94, quoting *Boreali v Axelrod*, 71 NY2d 1, 14 [1987]). We therefore must modify Supreme Court's order to declare the entirety of part C of chapter 383 unconstitutional.

### III. *Multistate Lottery*

Part D of chapter 383 of the Laws of 2001 directs the Division to operate and administer within the state a multijurisdiction and out-of-state lottery in cooperation with a government-

authorized lottery of one or more jurisdictions (*see* L 2001, ch 383, part D, § 1; Tax Law § 1604 [a]). Part D further authorizes the Director of the Lottery to enter into agreements for a multistate game, which may include "a combined drawing, a combined prize pool, the transfer of sales and prize monies to other jurisdictions as may be necessary, and such other cooperative arrangements as the director deems necessary or desirable" (L 2001, ch 383, part D, § 3; Tax Law § 1617). Pursuant to the statute, the Division entered into an agreement (hereinafter the Mega Millions agreement), along with the operators of lotteries in nine other states,[18] for the joint operation of a multistate lottery game known as Mega Millions or other games that may be offered from time to time. Under the Mega Millions agreement, the parties share operating costs equally, liability for prize payments is determined by the percentage of the state's Mega Millions sales as a proportion of the total sales, and revenues generated within each state that are not allocated to prizes or joint operating expenses remain within the state for distribution in accordance with the state's constitutional, statutory and regulatory requirements.

Plaintiffs assert that part D, as implemented by the Mega Millions agreement, violates NY Constitution, article I, § 9 because the multistate game is not "operated" by New York alone, but by several states. Further, plaintiffs challenge part D on the ground that the "net proceeds," within the meaning of article I, § 9, raised by other states participating in the multistate lottery cannot be dedicated exclusively to education within this state. We are not persuaded by plaintiffs' arguments.

As discussed above, NY Constitution, article I, § 9 (1) generally prohibits gambling, but exempts state-run lotteries, among other things, from the ban. The NY Constitution permits "lotteries *operated by the state* and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the [L]egislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the [L]egislature may prescribe" (NY Const, art I, § 9 [1] [emphasis added]). Under the Mega Millions agreement, while certain joint functions and necessary operating costs are shared, New York controls the operation of the lottery within its borders. New York determines the allocation of net proceeds raised within the state, the manner in which Mega Millions

---

**18.** The other states participating at the time were Georgia, Illinois, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Virginia and Washington.

tickets are sold and distributed within the state, the commissions paid for the sale of tickets, and the advertising and marketing of Mega Millions. The agreement expressly provides that "[i]n the event of [a] conflict between this [a]greement and the constitution, statutes, rules or regulations of any [p]arty [l]ottery, the [p]arty [l]ottery's constitution, statutes, rules and regulations shall control." That is, New York law will control in the state should there be a conflict with a provision of the agreement. Further, all claims regarding tickets purchased in New York must be resolved according to New York law and the state is not responsible for the negligent acts or omission of the officers, appointed officials, employees or agents of any other state.

Under these circumstances, it cannot be said that New York has ceded control of the multistate lottery. Although New York has contracted in the Mega Millions agreement to reimburse other states for the performance of administrative functions such as possession and transfer of grand prize funds and the actual drawing of the multistate lottery numbers, nothing in the NY Constitution forbids the Division from contracting with outside parties to perform administrative functions. NY Constitution, article I, § 9 (1) requires only that authorized lotteries be "operated by the state," i.e., supervised or controlled by the state, as opposed to a private entity (*see generally* 3 Lincoln, The Constitutional History of New York, at 34-37 [discussing the historical distinction between public and private lotteries]); it does not mandate that the state alone must perform all aspects of lottery operation (*cf.* 2002 SC Ops Atty Gen, 2002 WL 735341, *2, 2002 SC AG LEXIS 56, *3 [Mar. 25, 2002] [Where the South Carolina Constitution provides that "(o)*nly* the (s)tate may conduct lotteries" (*see* SC Const, art XVII, § 7 [emphasis added]), the state may not delegate any functions in operation of lottery to private entities or other states]). Indeed, the Division routinely contracts for equipment, technology and services needed in the operation of other lottery games and plaintiffs do not dispute that such delegation of administrative functions in other games is proper.

Contrary to plaintiffs' argument, we perceive no significant distinction between the state's contracting with private parties to perform administrative functions and similar contracts with other states (*see State ex rel. Ohio Roundtable v Taft*, 2003 WL 21470307, *5-6, 2003 Ohio App LEXIS 3042, *15-18 [2003], *appeal denied* 100 Ohio St 3d 1484, 798 NE2d 1093 [2003]). Although plaintiffs assert that New York may not treat its coequal

sovereigns in the same manner that it treats private vendors, we note that New York may withdraw from the Mega Millions agreement upon six months' notice or at any time if the multistate game is conducted in a manner that violates New York law. We conclude that even under a narrow interpretation of the constitutional provision, New York retains sufficient supervision over the multistate lottery, through the Mega Millions agreement and regulations issued pursuant to that agreement (*see* 21 NYCRR part 2806), to satisfy the constitutional requirement that a lottery be "operated by the state" (NY Const, art I, § 9 [1]; *see generally Tichenor v Missouri State Lottery Commn.*, 742 SW2d 170, 174 [1988] [Multistate lottery is permissible under a constitutional provision authorizing establishment of a "Missouri state lottery"]; 1990 Del Ops Atty Gen No. 90-I019, 1990 WL 482340, *1, 1990 Del AG LEXIS 3, *1 [Nov. 19, 1990] [Multistate lottery, as conducted by unincorporated association of state agencies through member lotteries' on-line systems is in accordance with Delaware constitutional requirement that lotteries be "under [s]tate control" (Del Const, art II, § 17 [a])]; 1987 Kan Ops Atty Gen No. 87-16, 1987 WL 290413, *1, 1987 Kan AG LEXIS 178, *1 [Jan. 29, 1987] [Multistate lottery is not precluded by Kansas constitutional provision allowing "state-owned and operated lottery" (Kan Const, art XV, § 3c)]]). In sum, nothing in the NY Constitution mandates that the lottery be operated exclusively by New York. In fact, the legislative history of the amendment permitting a lottery indicates that the specific details of the operation of the lottery were to be determined by the Legislature (*see e.g.* New York State Senate Debate on Senate Bill S 897, Feb. 7, 1966, at 319, 331-332, 363; New York State Senate Debate on Senate Bill S 289, June 14, 1965, at 4796, 4807-4809).

Similarly, plaintiffs err in asserting that New York has yielded an essential element of its sovereignty by agreeing to delegate administrative functions to other states' agencies. As explained above, New York law controls in the event of a conflict with a provision of the Mega Millions agreement. We note, in addition, that the Mega Millions agreement provides that New York "does not waive the defense of Sovereign Immunity . . . which [states] may have relating to disputed ticket claims and/or player prize claims, nor does [it] pledge the credit (if applicable) of the respective states in relation to such disputed claims." The cases relied upon by plaintiffs in arguing that interstate entities, public authorities and public benefit corporations are not "the

state" are inapposite because, here, the Mega Millions agreement creates no such entity (cf. *Hess v Port Auth. Trans-Hudson Corp.*, 513 US 30, 40-51 [1994]; *Collins v Manhattan & Bronx Surface Tr. Operating Auth.*, 62 NY2d 361, 366 [1984]; *John Grace & Co. v State Univ. Constr. Fund*, 44 NY2d 84, 88 [1978]; *Braun v State of New York*, 203 Misc 563, 564-565 [1952]).

Finally, we reject plaintiffs' contention that the net proceeds from the multistate lottery are not devoted "exclusively to or in aid or support of education in this state" (NY Const, art I, § 9 [1]). Plaintiffs challenge the Mega Millions agreement on the ground that monies transferred pursuant to it by New York for operational expenses and prizes promote the operation of lotteries in other states that generate funds for purposes other than education in this state. The central premise of this argument—that it is improper to deduct from net proceeds costs that are incurred by a "central administrative apparatus" operating the multistate lottery in other states—mischaracterizes the nature of the Mega Millions agreement. The administrative costs paid by New York do not go to a central administrative apparatus that promotes the lotteries in other states—there is no such central entity operating the multistate lottery. Instead, the funds in question are transferred by New York to other states to reimburse those states for actual operational expenses incurred in providing services to the Division in conjunction with the multistate game.

It bears emphasizing that the funds transferred by New York to other states may be used only for payment of jackpot prizes and reimbursement of preapproved operational expenses. New York funds simply are not used by other states to reduce their administrative costs or to fund their governmental purposes, as plaintiffs allege. Moreover, unlike the revenue distribution system established under part C of chapter 383 of the Laws of 2001, there is no evidence that the administrative expenses approved in connection with the multistate game are artificially inflated to include expenses that are not necessary for the operation of the game itself. Accordingly, given that the net revenues of the multistate game—the gross proceeds less expenses or costs that may be properly deducted (*see Matter of Boerner*, 58 Misc 2d 144, 147 [1968], *supra; Matter of von Seidlitz*, 6 Misc 2d 583, 584 [1957], *supra*; Black's Law Dictionary 1222 [7th ed 1999])—remain in New York and are dedicated to education in this state, as required by the lottery exception in NY Constitution, article I, § 9, plaintiffs' challenges in this regard to part D of chapter 383 fail.

## Conclusion

We determine that parts B and D of chapter 383 of the Laws of 2001 are constitutional as challenged. While VLTs themselves constitute a valid "lottery" within the meaning of NY Constitution, article I, § 9, the revenue distribution scheme set forth in part C, directing vendors to reinvest a portion of their fee in breeding funds and enhanced horse-racing purses, violates the constitutional requirement that "the net proceeds" of state-operated lotteries "be applied exclusively to or in aid or support of education in this state as the [L]egislature may prescribe" (NY Const, art I, § 9 [1]), rendering part C invalid.

CARDONA, P.J., PETERS, SPAIN and CARPINELLO, JJ., concur.

Ordered that the order is modified, on the law, without costs, by reversing so much thereof as declares part C of chapter 383 of the Laws of 2001 constitutional; part C of chapter 383 of the Laws of 2001 declared unconstitutional; and, as so modified, affirmed.